Good morning, Your Honors. My name is Don Miles. I represent the appellant-defendant Golden Eagle Insurance Company in this particular case. The issue before you really is one as to whether the policy issued by my client covers the property damage that was caused by the paint that was applied to these homes. CMS provided defective paint to SWA. SWA painted seven homes. Of these seven homes, all of them had to be repainted, three of them twice, for a total of 10 homes. It cost approximately $5,000 to $8,000 to repaint each of these homes for a total damage claim of about $80,000. And now we're facing a stipulated judgment of $500,000 as a result of what's called a Dam-Ron or Morris Agreement in Arizona. There's about 11 cases cited to you dealing with this proposition as to whether or not paint or something like it, loss of use or demunition in value, can be associated with property damage. This is clearly not bodily injury. The policy only covers bodily injury and property damage. And that's a question of state law. Yes, the state law. The state law case that's going to be applicable in this case, Your Honors, would be University Mechanical Contractors v. Puritan. Right, but the Arizona Supreme Court probably hasn't spoken on this exact question. It has not. The closest it's come, and we could sit here and debate the cases, and six are in favor of the appellee and five are in favor of me and other jurisdictions. But in Arizona, the court really has spoken on this issue. And what it has said is that loss of use or demunition in value can constitute property damage. But that particular case, University Mechanical, did not have an impaired property exclusion. They never addressed that issue. It was never presented to the court under those circumstances. Why do we have to deal with whether this is property damage when you have that other part of the policy that covers loss of use? And here, clearly, it was the loss of use of the premises. I don't know why we have to worry about Arizona law here in that respect. Well, Justice Block, I would submit this to you, that there's no evidence before you that anyone lost any use of anything. Well, people moved out. They had to be relocated, right? I don't know where they were located. I don't know how long they were out, and I don't know what damage that associated with it. Well, that deals with the damage aspect. But, conceptually, people did move out. There's no question about that. Some people did not. We don't know who moved out and who did not. But really, you're not going to sit here and dispute today in front of us, are you, that people were inconvenienced and that it's at least alleged that some people had to move out. Maybe everybody didn't, but at least somebody did, right? And they were inconvenienced. They were inconvenienced. The only evidence we have is that items were covered when it was repainted. Right. When these houses were painted, they were painted as new construction, and we had people who had moved in who had furniture and lives going on in these homes. That's correct. We're not really going to dispute that these folks were severely inconvenienced and it is likely that at least some of these folks had to move out of their house when it was being painted. Agreed. Okay. So we have the loss of use, and that is the real issue. There's no evidence of diminution in value. So the focus is on the loss of use. Is that compensatory? Is it property damage? If yes, and we can conclude yes, is whether or not the impaired property exclusion under the policy addresses this specific issue. Isn't that your best argument here? Yes, I think it is, Justice Block. I really do. And it talks about if it can be restored by the use of repair, replacement, adjustment, or removal, there's no coverage. So the real question before you is the only cure for this was repainting the walls. Nothing was damaged. Nothing was taken out. There was a sealant applied and the paint was applied, just like if I painted a bad color in my house and I painted over it. That's all that was done in this particular case. Under those circumstances, does repainting constitute repair, replacement, under this policy? And we submit that it does. The common sense definition of repairing something is, in fact, to do it over again. There was no additions. The other cases that have addressed this, the corn case, for example, talked about the fact that they addressed the impaired property clause under Corn Plus versus Continental Casualty, and they said under the circumstances of that case, where corn mush was damaged because of defective welds, by fixing the defective welds, you don't fix the bad corn. Therefore, the impaired property clause was inapplicable. But in this case, the distinction is the bad paint was fixed by repainting, and it fixed the problem. Therefore, the repair fixed the very nature of the impaired problem or the property damage that was alleged in this particular case. So the impaired property exclusion, of which there is no case that anyone cited to you that is on point, is something you must address from a common sense standpoint. Any other conclusion renders the exclusion itself completely invalid. You could not have a more case directly on point as a paint. The paint's defective. The cure is repaint. That is, in essence, what this particular clause is meant to address. Any other interpretation renders it completely ineffective, and you couldn't conceive of a circumstance where it otherwise would apply. Here's what the district court judge said. A lengthy decision, well reasonable. When it came to the impaired property clause, it was one paragraph. And the judge said, I don't think that that element is satisfied. The walls in this case could not be repaired merely by replacing the CMS paint. In addition to repainting, the walls had to be prepped. The walls had to be sealed. The homeowners had to be moved out. I don't know what moving out has to do with repairing or replacing. And he thought that was enough to find that the exclusion did not apply. You disagree with that. You think that's basic, classic repairing, and that's all we're talking about. Judge Campbell's a fine jurist, and we had an excellent time debating this issue for a great length of time. And I will submit to you that if you repaint a wall, if you do it twice, you may do it two different ways if you do it twice yourself. There's never going to be exact circumstances, but one of common sense is, yes, you're going to prep the walls. Supposedly there was a sealant put on the wall in addition to the paint. But in essence, they were repaired by repainting the walls. There was no damage to those walls. And what we're talking about is loss of use damages. This impaired property exclusion is meant to deal with the exact circumstances here, Your Honor. I'd like to address a second part of this case, because I think ultimately you're going to have to come to the conclusion as to whether or not sealing and painting is different than painting. Or is that the same thing, and is that the common sense understanding with regard to whether or not there was property damage? When you say it was sealed, we were talking about what kind of a coat. What were we putting on this, a primer? What you have is what I have. There was no discovery taking place in this case to discover exactly what that sealant was. Was this put on because the prior paint discolored every time that any kind of liquid, including the paint itself, was put on it? So is that why it had to be sealed? Justice Bivey, that's my understanding, yes. I'd like to address the Damron agreement. Before you get to that, the district court didn't reach the question of reasonable expectations of the insured. Is that something, if we agreed with your position, is that something that we would have to remand for the district court to consider? Because that was their argument, because in Arizona you do have the reasonable expectations line of cases. We could debate reasonable expectations argument, Justice Thomas, but my understanding of reasonable expectation is it must be based on some affirmative act or statement made by the agent, the company, or the policy that led to that belief. It can't be the subjective belief of someone who merely says, I just had a belief uncovered for everything. I haven't reviewed the Arizona cases on that. In other states, that's not the way reasonable expectations are analyzed. It's a subjective expectation that's objectively reasonable, would be the controlling end factor. But in any event, we don't reach that here, but the district court didn't. So if we agree with you, how does the fact that the district court didn't address that issue play into our analysis? Well, I don't think it is part of your analysis, but if you send it back, it's something that could be relitigated in terms of whether or not there was a reasonable expectation of coverage. I guess that's something we have to address again. Okay. The Damron agreement. The Damron agreement is simply a contract between what amounts to SWA and CMS. The lawsuit was filed by SWA, not the homeowners. The homeowners' problems was cured. SWA repainted the homes, lost about $80,000, and turned around and sued CMS. After that, there were three letters that were sent by counsel representing CMS and SWA saying, look, insurance company, there's coverage under these circumstances, and all three times they were denied. They apparently entered into an agreement in which $72,000 was going to be paid by CMS to SWA. This agreement was never consummated in writing. A lawsuit was then filed, and it was tendered to the insurance carrier, who accepted the tender because that lawsuit contained an allegation of negligence. Negligence is covered under the policy, so it's defended under a reservation of right. Counsel was appointed. It was more than a year later that the stipulated judgment was entered into. The district court judge, Judge Campbell, looked at this and says, look, I think it was a valid Damron agreement, and, therefore, you do not get to dispute the reasonableness of the damages stipulated to a $500,000. Our point was no. It was tendered to us. It had to be tendered to us, and when it was tendered, it contained different allegations. It contained allegations of negligence that were never mentioned in the prior submissions to the company. And, therefore, we have the right under Arizona law to a reasonableness hearing to determine the reasonableness of the stipulated damages under the circumstances. The judge said, well, Mr. Miles, under these circumstances, they had a valid contract. And the judge is right. They did. And they can sue each other for the breach of that, whether it's appropriate or not, or set forth any remedies they have, but the fact is they could not contract for or hurt the rights of the insurance carry under the circumstances. Had an anticipatory breach here. I mean, isn't that sufficient under Arizona law? Why do you need to do more? And the fact that they did ultimately have a reservation of rights, wasn't that kind of superfluous in light of the fact that there was a clear breach? If there was an anticipatory breach, why did they tender the defense of the case? Because under the policy, I guess they sort of like have to make a judgment call. Why not just make sure that you're being extra cautious? Because the policy language does say that once a lawsuit is initiated, you have an obligation to notify the carrier. I can understand why that might be somewhat of a problem. And so they exercise extreme caution. But before that, at the time that the breach happened, there was no ifs, ands, or buts about it. What were they supposed to do in the face of that breach? They were facing no lawsuit at the time. But under Arizona law, as I understand it, and maybe I'm wrong, and maybe it would be different in other jurisdictions, there is such a thing as an anticipatory breach, correct? Yes, Your Honor. In fact, that's why that doesn't apply here. You say that subsequent events render that anticipatory breach nugatory? You cannot enter into it. You can enter into a Damron agreement, and that agreement may or may not be valid. The anticipatory breach excuses performance of the cooperation clause under the policy. But as in this particular case, when the facts upon which the insurance carrier is making the decision are incomplete, and you subsequently file a complaint setting forth allegations that are covered, you can defend under a reservation at that point in time, and you have the absolute right to conduct a reasonableness hearing. The fact that they entered into a Damron agreement based upon the allegations which were incomplete may or may not be valid later. What were the incomplete allegations? Well, in all of the tenders previously, there was no allegation with respect to negligence. The negligence count was added in the complaint. The complaint itself, if you look at it, that SWA filed against CMS alleges only lost profits. That's another issue that wasn't covered. The lost profits of SWA are not property damage. So when it was couched in terms of, hey, we're going to be sued for lost profits by SWA, that's not covered bodily injury or property damage under the policy. Now, when they actually filed the complaint, they filed it for negligence, and they put a negligent count in there, which is covered under the policy, but it was defended under a reservation. Part of the argument in this case as to why we would like a reasonableness hearing is the fact that these damages have been justified, and that amount has been justified because of a loss-of-profit claim of several hundred thousand dollars that is not property damage under the policy and not compensable. That was incurred by SWA, not the homeowners, not the paint causing damage or loss of use. It occurred to SWA, who filed the lawsuit in this case. Let me get back, if I may, to the impaired property exclusion. This was decided on the basis of summary judgment, correct? Yes, Your Honor. Do you think there's an issue of fact at all that perhaps ought to be plumbed at a trial as to whether this was repair, replacement, et cetera, in light of the issue of whether sealant is something that does or does not affect the property as such? Yes, I do, Your Honor. So you think it should be a factual hearing that should take place? Yes, I do, Your Honor, at a minimum. You don't think summary judgment should be awarded necessarily that the exclusion does apply. That's not your position? I'm sorry, I didn't understand. You don't believe you're entitled to summary judgment on the issue of the application of the impaired property exclusion? I'll certainly take that, Your Honor, but if you find a fact and send it back for the judge to address, I will take that too. I just want to clarify your position. Do you think there are facts or not? Do you think there are disputed issues of fact on repair in this record or not? Judge, I think ultimately it's going to come down to the fact that some judge is going to hear the facts and make a determination as to whether or not putting a sealant and painting is repair. And we could take and hear evidence from experts all over the country as to what sealant, what were the chemical process, what was in the sealant, how long did it take to apply the sealant, what it cost, and then the paint that was put on top of it. The question is, by definition, do you find that is a repair? And we submit that that is a repair. Do you think that would require some expert testimony? I guess I don't understand your position. I mean, I thought you were taking the position that as a matter of law, the exclusion applied and that's the end of the story. I am. Then why are you saying you need an evidence, there are genuine issues of fact? Are you just kind of fishing for a lesser included, as we might say, analogy? Judge, yes. I mean, I can't be any more blunt than that. But under the circumstances, I think it's repair. I think it's clear that it's repair from a common sense basis. But if you do not think it's clear and there needs to be more factual finding, I could understand that, too, and that can be resolved. Do you want to save some time for rebuttal? Yes, I do. Thank you very much. Thank you. Good morning, Your Honors. Michael Ryan on behalf of plaintiff SWA. The district court was correct in all of its rulings, and SWA respectfully requests that this court affirm in total. First of all, under the great weight of authority and the authority that is most persuasive and most on point, the negligently mixed paint by CMS did cause property damage to the walls of these very expensive custom homes. How does it cause property damage to the walls? It doesn't weaken the wall board in any way, right? Not at all. It has the effect that what we've got is we've got discoloration. We've got something that we're not happy with. If SWA had come in and I paint for my own enjoyment and for the amusement of my wife and children, but if I had been painting for SWA and I had not followed the good A formula and filling in all of the things, and I'd left big streaks on the wall, would we say that the walls were damaged? Yes, the walls would be damaged. However, it was you doing the work, and therefore there would not be coverage in that situation. The cases make a very clear distinction in that case. That's not the case here. We have CMS, who is the supplier of the negligently mixed paint, and we have the innocent contractor, my client, SWA, who applies the paint in exactly the way it's supposed to be applied. It wasn't applied in an improper manner. But I'm curious. So you think that we would say that it would be sort of correct English to say the walls have been mispainted, but the walls are damaged. There cannot be. We have property damage because I have a streak over here, which I'm going to mark with a little piece of blue tape, as contractors do as we go through, and so my walls have been damaged. There could not be a better example than what the district court used, and the district court used a fire engine red Corvette and a vandal comps and takes white paint and splashes it all over the Corvette. Is the Corvette damaged? It runs perfectly fine. There's nothing functional that is impaired with the Corvette. Is there any layperson? And, by the way, in KEGGIE, we have to look at what a layperson would interpret as damage. Let me change the Corvette. If you take it over, and I want it painted candy apple red, and it comes back and it's been painted candy apple red, but as I walk around, I can see a place where I ended up with an air bubble that left me, and it's not smooth to the touch on one fender. Do I say in ordinary conversation, my Corvette's been damaged? The guy's damaged my Corvette. Now, I've got an action in contract. I didn't get the quality of work that I expected, and I expect I would take it back, and they'll buff it out, and may have to touch it back up. But do I say the Corvette has been damaged? I would say, if it was my Corvette, that it was damaged. Even though it was rusty and awful before I took it in, they filled it in with the filler, and it's clear that they've added value to it, it's just not all the value that I thought. Well, that changes the hypothetical, because the damage really is the diminution in value. If you have a brand new... My expectations over what I expected to have when it came out of the shop. Over what you expected to have, because the district court's example was not an old, rusty Corvette. It was a brand spanking new, fire engine red Corvette. And what happened is a vandal comes and splashes white paint all over it. Is there anyone who would argue that that Corvette is not damaged? What we have here is a situation where the paint was properly applied, and when it would get wet, with anything, water, insecticide spray, anything, including other paint, it would severely discolor. And the letters from the builders specifically stated that they'd never seen anything like it before. Now, it shouldn't really matter, but I think it does. These were not tract homes. These were expensive custom homes for which the owners paid very good money for. And the owners clearly would think that if they get their walls wet at all and the walls discolor, that that would be property damage. That is injury to property, and there's no better case than the Dakota block case. In that case, we have the blocks that were finished by the supplier. They were provided to the contractor who put them in a school. It was a public entity. And the court found that, in fact, there was diminution in value. But that's a South Dakota case. That is a South Dakota case. If you go to my home state of Montana, I don't think you cited Swank, but Swank is on all fours, basically, with this case. And the Montana Supreme Court would hold that this is property damage. They take a very generous view, I guess, if you want to put it that way. They define property damage as material and physical alteration resulting in a detriment. Now, Arizona is a whole different kettle of fish. What leads you to believe that the Arizona Supreme Court would follow Montana and South Dakota as opposed to other states? The university mechanical case. In that case, we had couplings, the O-ring couplings that were manufactured. And they were supplied, again, to the innocent contractor who installed them in the innocent owner of the solar system's piping. And the court specifically stated there were two findings in that case. The first was that the couplings clearly were, the defective couplings, clearly constituted damage, physical damage, to the tangible property, the solar heating system, the piping. The second was that there was a loss of use. And it was on that loss of use that the case turned, because the question in that case was whether, because the leaking apparently started or happened after the policy was in effect, whether the loss of use provision, which did not put a time frame and did not have to occur during the policy period, whether that, in fact, did constitute and provide coverage. And the court found that it did. So even if we agree with everything you say, do we not ultimately have to come down to resolving the impaired property exclusion? Yes. And then the language seems to be very broad. It talks about if the property can be restored to use by the repair, replacement, adjustment, or removal of your product or your work. And then the district court judge had a very focused view of this and thought that the walls in this case could not be repaired merely by replacing the paint. And in addition to repainting, the walls had to be prepped, the walls had to be sealed, and homeowners had to be moved out. I don't know what the moving out of homeowners has to do with repair replacement. So you would agree with that, I take it. So we're left with, you know, the issue of prepping and sealing. Isn't that what this comes down to in the face of a summary judgment motion? Your Honor, I agree with you that the impaired property exclusion must be dealt with, and the district court properly dealt with it. First of all, I need to go into some factual misconceptions, and I'm sure they were inadvertent on the part of the appellants. But the appellants stated that CMS provided paint to fix the problem. That's incorrect. That did not happen. What had to happen was that the paint had to be, there was a sealant that was used, and then Sherwin-Williams, a different product, Sherwin-Williams Dunn-Edwards was used in order to, because. . . I don't understand what's so factually challenging about this. Well, let's first take repair. The negligently mixed paint itself is what we're talking about. How do you repair negligently mixed paint? It was on the walls. You can't. You can't get under the hood. You can't fix it. You can't repair it. It had to be sealed in the walls. Now let's talk about. . . Okay, and I ask this question of Mr. Miles. By sealed, what do you mean? We put a white sealant on this? We put the white paint we usually put on walls as a prep? Is that what we did? What do you mean by a sealant? There was a primer, and I have to concede that I am not as knowledgeable as Your Honor on the painting process. You haven't been amusing a family with your painting? I have been, but for an entirely different reason. I paint so badly, they were kind of laughing at all the streaks I left on the ceiling. But in this particular case, what had to happen was there was a primer that had a sealant in it. Now, it wasn't the sealant Mr. Anderson stated that they use after smoke damage. I don't know what that's called, but he didn't have to go that far. How is this different from a primer? Other than it has a sealant in it, I don't know. Was this all water-based paint or was it oil-based paint? It was top of the line, this is all I know. It was top of the line Sherwin-Williams, Dunn-Edwards paint. But you don't know whether it was oil-based or water-based? No, I do not. But whatever they did, it's fine today. These homes are in perfect condition, albeit with all this aggravation and these problems that ensued. But it did the job, did it not? Well, it certainly did the job, but the question is whether that was a repair. It wasn't a repair. A replacement? Whether it was a replacement. It wasn't replaced with CMS paint. It was prime-sealed and then replaced with other product. It could have been replaced with CMS paint that had been properly mixed. I understand why the contractor might say, I don't have any confidence in your CMS any longer, so I'm going to get Sherwin-Williams paint down the street. Whether it could have or not, an important fact is that they did try to repaint three of the homes just with paint. It didn't work. With the CMS paint? With CMS paint. That's because it was self-discoloring. It was discoloring any liquid that was applied to it, discolored it, including the addition of CMS paint. Including the addition of any paint before the primer sealant was put on. Mr. Ryan, how is this insurance agreement different from a performance bond? The performance bond, it's different because SWA is an innocent contractor. It did not malperform at all.  What happened was that the negligently mixed paint was supplied to SWA. SWA applied it to the homeowner's expensive custom homes, and it damaged the walls. So a performance bond would be like all of the cases or most of them that were cited by Mr. Miles. They were breach of contract for the work that the insured was doing itself. The insured company's ---- The insured here would be CMS. The insured here would ---- Which was to provide a particular quality of paint which they failed to do. Yes, which they negligently mixed the paint and provided that to an innocent contractor who used it on innocent third-party homes. That's the hallmark of what a CGL policy is supposed to cover. It's supposed to cover property damage caused by the product. So I gather part of your argument is we never reach the impaired property exclusion because it's property damage in the first instance, and the impaired property exclusion only applies in those instances when it's not property damage? Or are you conceding that they're independent in this circumstance? I concede that they are independent. The burden was on us, SWA and CMS, to establish coverage or that there was property damage under the policy. Then the burden shifted as far as policy exclusions, including the impaired property exclusion, to Golden Eagle to establish that some exclusion applied. And respectfully, they failed to do that. The impaired property exclusion does not apply. The other important part of that is that the loss of use is excluded from the exclusion. The impaired property exclusion specifically states that the exclusion does not apply to loss of use, and there was loss of use in this particular case. May I? Would you address the reasonable expectations argument? Yes, Your Honor. The court is correct that if, and I presume you want me to assume the same thing you asked Mr. Miles to assume, and that is that it would be remanded and whether that argument needs to be remanded and decided by the district court. Right. It would be our position that it would need to be remanded for that. Also for the Parsons argument that we made, where Golden Eagle provided defense counsel, quote-unquote, who tried to teach Golden Eagle how it could attack the Damron agreement that it's ensured had entered into. So those would need to be decided by the district court, since they were not decided previously. However, it would be our position that none of the exclusions do apply in this case, and that, in fact, there was coverage as the district court found. Turning to the issue of Damron and Morris. This is something that's not completely unique, but fairly unique to Arizona law. When an insurance company such as Golden Eagle repudiates the contract, and that's exactly what happened. They anticipatorily breached the contract and said there is no coverage either for defense or indemnity. Then the insured is subjected to the sharp thrust of personal liability and is entitled to protect itself. I need to correct something that's very important for purposes of this argument that Mr. Miles stated. Mr. Miles stated that the complaint alleged something totally different than what was being provided to Golden Eagle in the letters leading up to its absolute denial of coverage. If the court looks at the record 523, it's the August 1st, 2001 letter written by Mr. Chris Gooch, who was representing CMS, to Mr. John Bergadamo, the claims representative from Golden Eagle, who had denied coverage initially. If you look at the facts, it states, quote, we understand that coding management sold paint to a contractor for use in painting homes. Further, it is our understanding that coding management inadvertently mixed certain components of the paint. And as a result, the houses were damaged to an extent requiring significant time and material to repair. Inadvertence, negligence, it's the same thing. There was no change in the allegation whatsoever. And in the letter on the second page, it clearly states that the damage to the homes was to the drywall of the homes. Golden Eagle had all of the information that it needed and that it had when the complaint was filed when it decided to anticipatorily repudiate the contract. That's what it did. It did so at its own risk. When an insurer denies coverage, it does so at its own risk. And after this Damron agreement was entered, and there can be no question that it was a Damron agreement. That was conceded. It was a Damron agreement between CMS and SWA. So why didn't you give them the opportunity to change their mind after you filed the lawsuit? I'm glad the court asked that question because SWA did not give them the opportunity to change their mind. CMS had assigned its rights as of March of 2002 when the Damron agreement was entered and payments started out of the insured's own pocket. CMS did not have any right to unilaterally tender this to Golden Eagle. It did so as is shown in the record. The counsel stated, listen, we're corporate attorneys. We don't know about insurance law. They did it out of an abundance of caution as the court recognized, just to make sure that they were complying with the law of Arizona. But it can't transmogrify. It cannot change a Damron agreement into a Morris agreement. And the policy behind allowing an insurer like Golden Eagle a second bite at the apple would be terrible policy because what would that tell an insurer that it should do? Let's deny coverage. Then later on, if it gets tendered to us, we'll go ahead and accept, and we'll defend under a reservation of rights. It's very important that there were no new additional allegations in the complaint that were not contained in Mr. Gooch's letter. Golden Eagle chose not to accept the defense. And we're talking about a defense here, defense in indemnity. They opened the claim on June the 6th of 2001. They issued a denial letter on June the 21st of 2001, and they closed the file on June the 25th, only a few days later. They put the reserves to zero. It is disingenuous to try to argue that that was not an anticipatory repudiation of the contract. It was, and therefore the law is very clear. Under Arizona law, they do not have the right to challenge the reasonableness of the agreement, and they do not have the right to subsequently try to accept a tender of defense that was unilaterally made by CMS. Just one quick question. We've talked about the idea that if there is an issue of fact, it might be remanded. But if we conclude that actually the construction of policy is an issue of law, what's your position on certification of the Arizona Supreme Court? I had not even thought of that until the Court mentioned it. Certainly that would be an option. University mechanical is something, is a case that is not absolutely clear. Of course, we believe it supports our position, but that would be an option. Okay. Thank you. Thank you. Before you launch into your rebuttal, do you have a position on certification? I think that would be a very good idea, Your Honor. There are a couple of issues for certification that might be very helpful given the new issues in this case. Well, is it significant enough that the Arizona Supreme Court would be interested in it? Well, it would be very interested, I think, on the Damron-Morris situation because you have a later tender after a Damron agreement that the parties believe was valid. The question would be can the parties inflict their will upon an insurance carrier who right now is given the absolute right after a tender to go ahead and have a reasonable hearing. But certification needed if everything reduces itself to the exclusion of the in-payment property. Then case over. You don't need any certification. No, we do not. You don't think there's anything for the Arizona Supreme Court to construe as to what repair means in this context? No, I don't. I think that's common sense, and this Court is well within their range to handle that. Okay. Go ahead. The one thing I just want to add with regard to the Damron agreement is the tender that occurred, occurred in I believe it was September or October of 2002. This case proceeded for another year, and Counsel Mr. Ryan was involved in the underlying case. So if there was no authority to do it, if it was a sham, if it was a joke, why didn't somebody stop it right away? Because Counsel was appointed and, in fact, represented the insured for some period of time thereafter. The tender was absolutely not necessary if, in fact, a Damron agreement was in place. Why would you do it? Why would you expend attorney's fees and costs at that point in time? The fact of the matter is regardless of what happened prior to October 16th of 2002, when that tender was accepted and it was made by competent counsel on behalf of the insured, we were entitled to a reasonableness hearing. That's what the law says in Arizona. Regardless of the effectiveness of the prior agreement, it does not matter, and that's been our point from the very beginning. I really don't have anything to add. Thank you, Counsel. Thank you very much. The case just heard will be submitted for decision, and we'll be in recess for the morning. Thank you. All rise. This court's session stands adjourned. This court is adjourned. Thank you. Thank you.
judges: Thomas, Bybee, Block